THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

CARLET D. WARD,

    Appellant,

v.

MBNA AMERICA (Bank of America),

    Appellee(s)

C.A. No. 13-3562
C.A. No. 10-759 SLR

## APPELLANT'S OPENING BRIEF

I. **Jurisdiction**:

The Appellant in the above case is appealing a recent decision handed down by the U.S. District Court of Delaware in Case No. 1:10-cv-00759-SLR by Judge Sue L. Robinson on July 23, 2013. Appellant filed a timely appeal on August 20, 2013 and it was docketed and assigned to Case No. 13-3562 in the U.S. Court of Appeals in the Third Circuit. The parties involved in this case are Carlet D. Ward, Appellant v. MBNA America (Bank of America), Appellee(s) (pages 1-2).

II. **Statement of Case:**
    A. Procedural History:

1. The case, Ward v. MBNA America (Bank of America) was filed in the Delaware U.S. District Court under Title VII of the Civil Rights Act of 1964 on September 6, 2010 and, was assigned to docket No. 1:10-CV-00759-SLR. Plaintiff was issued a right to sue letter from the EEOC (Equal Employment Opportunity Commission) on June 7, 2010 (pages 3-13).
2. The Plaintiff is a black African-American female and, was 50 years old at the time of this filing.
3. From June to September, the Plaintiff attempted to retain an employment discrimination attorney to represent her in filing the civil suit in a court of law against her former employer, MBNA America, who had discriminated and retaliated against her in employment from 2005 to present day. She was unable to secure legal counsel

as each law firm declined from taking her case citing that they didn't think the case had any merit; their firm could not expend the time to try the case; or, excessive upfront retainer's fee was needed in the amount of $10,000; or, there was a conflict in interest. A list of the law firms who had declined was also attached to the original complaints as filed in the U.S. District Court on September 6th as proof, that the Plaintiff had indeed tried to find legal counsel to represent her in this case as well as any or all initial consultation fees that were paid at the time of each visit (pages 14-15).

4. Also, when Plaintiff filed her civil suit in District Court on September 6th, she also requested that an "injunction" be issued to her former employer, MBNA America, as a means to stop and preventing them from furthering harassing her – which had become a serious menacing problem with incidents of ongoing blackballing and harassment Plaintiff was still experiencing since being terminated by MBNA America back in March, 2006 (page 4). See Berg v. LaCrosse Cooler Company, 613 F2d 1041 (7th Circuit, 1976); Section 107 of the CRA of 1991.

5. Because of Plaintiff's financial hardship – the case was filed in forma pauperis. Plaintiff also checked marked that a court appointed attorney be also granted to assist with the case. The Court ordered that the case be continued in forma pauperis (page 16). See 42 U.S.C.§ 2000e-5(f)

6. The civil suit was filed in the amount of $350,000 in damages along with an injunction as well as that the case be given a jury trial. No injunction was ever processed or, ordered (page 4).

7. On October 17, 2010, her mother, Mrs. Thelma D. Council, lost her life to an lethal overdose of medication administered to her by her care providers and caregivers.

8. On March 8, 2011, the District Court on behalf of the indigent, Carlet D. Ward, served a civil action complaint of employment discrimination to Bank of America's Employee Relations, V.P., Debora E. Bartol in Charlotte, N.C. – Headquarters for Bank of America (MBNA America). She was listed as the contact person from the EEOC's office (page 17).

9. On January 25, 2011, MBNA America files an Answer to Plaintiff's Complaint and an Amended Answer to Complaint on January 31, 2011 (pages 32-41).

10. On May 9, 2011, Attorney for Bank of America (MBNA America), James H. McMackin, III of Morris James law firm filed a "Defendant's Motion to Dismiss" claiming the complaint was "time-barred", etc. (pages 41-50).

11. On May 16, 2011, Plaintiff representing herself, without legal counsel in Pro Se, answered Defendant's Motion to Deny/Reject Dismissal by effectively arguing that (1) Plaintiff did exhaust her administrative remedies; (2) that under Title VII – it is a fact that there are "no administrative remedies or, little hope of stopping discrimination without going to court"; (3) that the Plaintiff had shown that the

2

discriminating purpose was a "motivating" factor in this complaint; (4) that under Title VII of the Civil Rights Acts of 1964 and 1991 prohibits discrimination and, intentional discrimination in the form of retaliation and unlawful practice of employment disparate treatment – a cause of action – as shown by Plaintiff in this case; (5) that the employer departed from its standard operating procedures to discriminate from its usual practices for posting and applying for job positions; and, (6) the case was not time-barred because a person can file a charge of discrimination after the 180-day time period has elapsed if the discriminatory practice is one that is deemed to be "continuing.". The MBNA America's attorney then "Replied to Plaintiff's Motion to Reject Defendant's Motion to Dismiss" but, it was ruled against them and the court ruled in favor of the Plaintiff and the case was ordered to move forward. See electronic file "Docket Item #15, Motion to Dismiss is Denied, ordered by Judge Sue L. Robinson" on January 11, 2012 (pages 42-46).

12. Plaintiff then received a letter from an attorney Ron Peloquin of Dover, stating that he was referred to her for legal consultation and or representation in this case. A meeting was scheduled and held on May 3, 2012 and, Attorney Peloquin declined taking on the case because he didn't believe it had merit enough for him to spend the time that he didn't have to work the case (page 47).

13. Plaintiff was then sent notification that Attorney Andrew Rennick of the Stewart Law Firm, was assigned to her case as appointed by the Federal Civil Panel to work the case until the end. A meeting was scheduled and held on June 14, 2012 in Wilmington and, Attorney Rennick made copies of the original complaint and reiterated that he is to work the case until the end. After a few weeks, Attorney Rennick contacted the Plaintiff to let her know that he will no longer be able to represent her because he was leaving his firm and has taken a position with another law firm (page 48).

14. On August 9, 2012 – a scheduled appointment was held with another court appointed Attorney, Jack Shrum of the Archer & Greiner, P.C. Law firm in Wilmington. He had also indicated that he had agreed to represent Plaintiff to the end of the case. At one meeting, the Plaintiff agreed to trust and leave a tape recording of a telephone conference meeting she had with the Human Resources Office at MBNA America with Attorney Shrum only to later find that the tape had been altered, digitalized and made unintelligible in audible and sound. It was to be submitted as evidence in the case. The date of that unfortunate encounter was held on November 15, 2012. And, at another face-to-face meeting on December 13, 2012 (page 49).

15. An Interrogatory was issued and requested for Production of Documents and Property to Plaintiff. Plaintiff responded and provided a completed answer and production of documents as requested.

16. Attorney Shrum, Counsel for the Plaintiff agreed to have Plaintiff submit to a deposition

3

against her objections and was scheduled and held on December 18, 2012 at the Morris James Law Firm Office in Wilmington. Plaintiff was asked before the beginning of the deposition whether there were any circumstances that would affect her ability to respond accurately to the deposition. The Plaintiff stated that she had gotten little to no sleep the night before and felt tired – not quite alert. Ms. Elena Marcuss, attorney for the defendant, asked if the deposition should be postponed until Carlet Ward felt better. The Plaintiff noted that she had begrudgingly come the distance so she'll go through with the deposition and do the best she can against her will. However, when the proceedings began, Ms. Ward did state, on record, that she objected to the whole deposition process. It was conducted most of the day from 10 a.m. to 3 p.m. Plaintiff had to leave by 3 p.m. to catch a commuter bus back to Dover. Defendants noted that the deposition was still incomplete and needed to be rescheduled for continuance on another date (See email communications, pages 50-53).

17. Plaintiff went to the office to leave her entire case file on January 8, 2013 with Attorney Jack Shrum for photocopying. It was in his possession from January 8th to January 29th, 2013 (See email communications, pages 50-53).

18. A letter of concern about Plaintiff's legal representation as appointed was sent to the case's Judge Sue L. Robinson raising issues of ethics on the part of the attorney and its court proceedings (pages 54-57).

19. Mediation was scheduled and held on February 19, 2013 at the U.S. District Court where MBNA America refused to negotiate a settlement in the amount of $100,000 plus attorney's fees. MBNA America's counsel only wanted to settle the complaint for $10,000. It, too, was rejected by the Plaintiff. Plaintiff was seeking damages in the amount of $350,000 plus any additional or, mitigating damages as recommended by attorney Shrum. The mediation was conducted by Mediator, Sherry Fallon, who openly reprimanded the Plaintiff for sending Judge Robinson a letter of concern regarding Attorney Shrum's unethical behavior and conduct towards her case and, at the same time, she gave him a copy of the letter while I was present. When she left the room to go down to mediate with the defendants, Attorney Shrum admitted that he had sabotaged Ms. Ward's tape and case and, that he took part in a "black bag job" against her. The trial date was set for September 16, 2013. The Plaintiff also asked the mediator to convey to the defendant's attorney one more time to reconsider and think about her offer of a settlement in the amount of $100,000 until at least March 5th. (pages 63-66).

20. On February 20, 2013, the law offices of Archer & Greiner submitted an agreement form to legitimize that Attorney Shrum is to officially represent the Plaintiff in the above-reference matter on a Pro Bono basis as appointed by The Federal Civil Panel Referral Service. Prior to that, there was no written agreement between the Plaintiff and Attorney Shrum as well as his law firm, Archer & Greiner (pages 61-64).

21. Because the Plaintiff was severely underemployed working only a temporary job at 12

      hours per week at $9.00 per hour and, didn't want to go into debt by being subjected to a wage garnishment situation, she declined the condition and fees in the agreement as set forth by the law firm. Instead, on February 26, 2013 she offered to retain their Counsel on a "contingency" basis as well as paying a "retainer's" fee (pages 60-65).

22. On February 25, 2013, the Plaintiff received a draft engagement letter requesting for a deposition to continue on Tuesday, March 5th and for the submission of documents not yet provided to be delivered at the deposition. Plaintiff was not able to consent to the scheduled deposition at that day and time for a continuance (pages 58-59).

23. The law firm of Archer & Greiner declined and, withdrew from representing the Plaintiff and motion their withdrawal to the Court on March 8th claiming that there was a breakdown in communication and discovery. The motion was so granted and ordered on March 12th followed by an answer by the Plaintiff's to her counsel's motion made on March 14, 2013 arguing that the law firm of Archer & Greiner and its Attorney Shrum's personal attacks on her were baseless and that they should be held accountable for Attorney Shrum's misrepresentation of her and her case and, that they should provide another attorney to finish the case or, be held completely responsible should the Plaintiff lose the case in the end – especially after her evidence was tampered with and while she was unfairly subjected to a deposition without the Defendants having to work hard for or, earned their way to a victory without subpoenas, motions to compel, etc. Plaintiff claimed that the only issue between client and attorney was an issue of "trust" and not having anything to do with a breakdown on communication or cooperation but to no avail, Attorney Shrum was released from his duties of representing the Plaintiff and, while the damage had already been done to the case (pages 67-73).

24. A Defendant's Motion to Compel to produce documents and to complete the deposition was submitted on March13, 2013. No order was ever issued (page 74-82).

25. Plaintiff Answered Defendant's Motion to Compel charging unethical conduct between both the defense and Attorney Shrum's law firm as well as misrepresentation. No order was ever issued as well (pages 74-82).

26. Plaintiff's Answer to Motion to Withdraw As Counsel to Plaintiff is filed on March 14, 2013 (pages 70-73).

27. Plaintiff's Answer to Defendant's Motion to Compel, April 2, 2013 (pages 83-85).

28. On May 17, 2013, the Defendant then submitted a Motion for a Summary Judgment based on their opening brief and support of their motion summary's appendix (Excerpts/pages 86-88).

29. On May 23, 2013, Plaintiff received an order from Judge Robinson stating that the Pre-trial Conference Scheduled for September 5th and, the jury trial set for September 16th had been postponed until further notice of the court (pages 89-90).

30. On June 4, 2013, the Plaintiff motion the court to Strike and/or to Quash the Defendant's motion for a summary judgment as well as a Motion for Out of Order as there were no

orders issued on the above motions from both sides in violation of Rule 110; 5Administrative Directive 178, JGS Rep Rules 1.1 to 5.2; Judicial Guidelines: Adoption, JGS; Preamble; Court Proceedings, JGS Rep Rules 4.1-4.3 throughout the remainder of his civil proceedings.   Still, no order was issued (pages 91-94).

31. On July 23, 2013, The Plaintiff sends an objection letter to Judge Robinson re: postponement of both the pretrial conference and the jury trial. Plaintiff states that she has been "wronged" by the court and, by counsel as appointed in this case. She was unable to find a replacement and, the court refused to replace Shrum with another appointed attorney. The U.S. District Court failed to hold the law firm Archer & Greiner responsible for Shrum's unethical actions in the legal profession and felt that the court should have made the Firm assign another attorney to the case or, be held accountable should the Plaintiff loses her case or, is dismissed. Plaintiff indicated that both law firms were in direct violation of Federal Provisions 18 U.S.C. Statutes 1512; 1503; 1505; and 371 (pages 95-98).
32. On July 23, 2013, Judge Robinson handed down a decision in favor of MBNA America against the Plaintiff and ordered the case be closed (pages 1, 99-100).
33. On July 24, 2013 the Plaintiff also submitted a Motion for Summary Judgment pursuant to Rule 56 of Federal Rules of Civil Procedures due to the defendant's haste in failing to exhaust its legal avenues under Title V: Disclosures & Discovery Procedures as Motion to Strike; Motion to Quash; and, Motion Out of Order (pages 91-94).
34. No other response, orders or correspondences was ever issued or received by Judge Robinson as challenged by the Plaintiff. Judge Robinson had already made her decision.
35. The Plaintiff filed an appeal to the U.S. Court of Appeals in the Third Circuit on August 20, 2013 followed by receiving a rejection letter to appoint counsel and, a time table on submitting required documents (pages 101-110).

### III.  Statement of Facts
  A. Background

1. This case originated from an unlawful discriminatory act committed by MBNA America on May 1, 2004. The Plaintiff, Carlet D. Ward, a black African-American female and who was 47 years old, at the time of hire, was hired as a part-time Account Specialist on October 20, 2003 working 19 hours per week at $8.00 per hour including bonus incentives.
2. Plaintiff was hired immediately by MBNA America, because she was a former employee of the National Education Association (NEA) Member Benefits located in Gaithersburg, Maryland, selling MBNA America's credit cards to their members. NEA is the largest teacher's membership organization in the United States. She was employed at NEA from 1997 to 2001 as a Teleservicing Representative and, had taken a leave of absence due to her illness and, never returning to work before relocating back to Delaware.

3. When the Plaintiff became employed with MBNA America in 2003, she was also on a leave of absence from Lord & Taylor Department Store (a May Company) in Fairfax, Virginia as a full-time Sales Associate. She was scheduled to return to work in December; got transferred to Christiana Mall but had to resign due to her illness. While employed at Lord & Taylor, Ms. Ward was one of the very last people to see Chandra Levy alive before she disappeared on May 1, 2001.

4. Former FBI Director, Louis Freeh had resigned from the Bureau the following month in June, 2001 and went on to relocate and work for MBNA America in September 2001, either before, during or, after 9/11. He was hired as their General Counsel in charge of the bank's Legal, Government & Corporate Affairs Departments; Special Investigative Unit; and, Ethics Office. At the time, it appeared to have only been a coincidence that the two of them ended up working for the same company - MBNA America – in the same state. Mr. Freeh took up residence in Greenville, Delaware as it seemed awkward for the Plaintiff because she had once filed a gross negligence civil rights case against the Federal Bureau of Investigation back in 1992. Ms. Ward stated that Mr. Freeh's presence was deeply felt while she was employed at MBNA America by him bringing in his own personal style of leadership mixing it with past and abusive practices of COINTELPRO operations (black bag jobs) in with MBNA America's Corporate and business style in the workplace and work environment (pages 125-132). *[Plaintiff also notes that both former FBI Director, Louis Freeh and, Attorney Shrum are Alumni's of Rutgers University in New Jersey. Ms. Ward is a former civil rights leader serving as a President of the Holyoke/Chicopee Branch of the NAACP (National Association for the Advancement of Colored People), in Holyoke, Massachusetts, for five consecutive years in the 1980's. She had been active with the NAACP organization for over 15 years. The FBI targeted the NAACP and civil rights leaders for many years.]*

5. As noted, MBNA America was the largest employer in the State of Delaware with 10,000 employees on their payroll until the breakup and acquisition purchase by Bank of America on January 1, 2006.

6. The Dover Call Center site was located at Silver Lake Boulevard in Dover and, was one of the primary call centers for MBNA America.

7. On May 1, 2004, the Plaintiff was denied an opportunity to post and apply for two

8. positions: Marketing Program Manager; and, PIN Coordinator, II, both located in Wilmington. She had just finish being evaluated for her six month performance evaluation review and was now eligible to post and apply for advancement opportunities. According to policy and procedures, managers are responsible for processing the job applications for their part-time staff but when the Plaintiff asked management to help her post for the two jobs, she got the run around and was told to go online and fill it out herself and, that the Marketing Manager's job was for their fellow co-worker and team manager, Brian Dolphin and, that she couldn't have that job. Brian Dolphin is white and male. That started the grievance process against her employer and, for which she was later denied a resolution or any remedy for what had occurred. She was denied a grievance procedure on February 4, 2005 and, Personnel refused to apologize for the mishandling of her right to post and apply

for vacant positions within the company (pages 111-124).

9. In the first one and one-half years of employment service at MBNA America, the Plaintiff had two team managers who were both female and African-Americans. The first was in the process of leaving to be transferred to another facility when she wanted to post and apply for the two positions however, she did leave instructions for one of the other team managers to process the Plaintiff's paperwork for her. That other team member, a white female, decided to decline from processing Plaintiff's paperwork and, instead, passed the responsibility on to Human Resources, who also declined from processing the necessary application and paperwork as well.

10. In March, 2005, team managers were offered an early release severance program after MBNA America took a loss from a bad deal it made with American Express to exclusively sell their credit cards and, from being over-staffed, management top-heavy and, stuck with excessive inventories of real estate. They had to downsize. The Plaintiff's manager was one of those affected by this loss and, decided to take the severance package that was offered to them through the early release program. Unfortunately, for the part-time Account Specialist staff, they were not eligible for any severance package or, early release programs.

11. In April, 2005, their call center received a new staff of managers who transferred down from the Newark office for the day shift and, who were all Caucasians. Their new Dover Site Center Director came on board around October. The Plaintiff was then assigned to Jessica Luppold's team and was retaliated against and was called a "nigger" and, was given bad and empty "ques" for outbound calls. This caused a drop in production and performance as well as affecting her eligibility status to make bonus for the month. At a human resource meeting involving her and Ms. Luppold, the Plaintiff requested to be transferred out of Ms. Luppold's team and was reassigned to another team manager, another white female.

12. Plaintiff was also turned down as a candidate for the position of "Manager-in-Training" program and, for a Teller II position (which was located at the Gold Exchange in Greenville and, only opened to the bank's investors who hold stocks, bonds, annuities, mutual funds, 401K plans, etc. – the town where Mr. Freeh resided in) and, the Plaintiff got transferred three times and was told by her last manager, Amy Fostick, that MBNA America had rigged the system so that she couldn't get a job online. Most job openings must be applied online.

13. The Plaintiff then became a victim of retaliation, excessive monitoring and, being placed on corrective action which had caused her to be ineligible to receive a monthly bonus as she was accustom to receiving due to her past performances.

14. Her final attempt to settle a grievance came on September 9th and September 14th, 2005

when she met with one of the Heads of Personnel, named Stephanie, from Hunt Valley,
15. Maryland; and, at a telephone conference meeting held with the Affirmative Action Department and staff member to discuss her complaint regarding disparate treatment
16. and for not being able to post and apply for available jobs and, how she was denied and refused a resolution to the problem (tampered taping of that telephone conference can be made available upon request).
17. Plaintiff experienced harassment from her co-workers and, was actually being snaked on her walking path to and from work and from and to catching the bus daily from Monday through Friday.
18. In December, she received an investment and acquisition package from Corporate Office which specifically detailed the acquisition and arrangements MBNA America had made with Bank of America who was now going to be their new owners on January 1, 2006. It specifically stated in that acquisition that there should not be any "outstanding" grievances or issues left unresolved before legal day one on January 1, 2006 or, if so, the acquisition would then become "null and void" (a missing document).
19. Just prior to the end of December 2005, Louis Freeh and several upper level management staff resigned from their positions.
20. In March, 2006, the Dover call center site was the first to be phased out and shut down by Bank of America. The Plaintiff loses her job.
21. Since that time, the plaintiff has only had four jobs which were not from applying online: (1) Macy's Department Store in October, 2006 as a walk-in applicant and, former May Company employee who was taken over by Federated Company who also happened to owned Macy's Stores. She was hired first as a temporary Christmas help and, later was called back to work full-time working 37 hours per day for $7.00 per hour. Her employment ended in February, 2008 after she called the police on her department supervisor for holding her against her will in one of their storage rooms; (2) as a walk-in and was hired for one full week of training as a Evaluator with the City of Dover Assessor's Office earning her $450 for the week but, however, she was not hired; (3) she received a phone call from Social Services to attend a training for the 2010 Census Bureau working as a temporary (Enumerator) Census Taker from April to August, 2010 where she worked 20 hours for $16.25 per hour; and, (4) from a face-to-face hearing held at the Unemployment Office regarding her eligibility status and inability to find work to the attending Deputy Referee and a Supervisor who then referred her to Delmarva Temporary Staffing and was hired immediately working part time – thirty days for full-time in March, 2012 and, from April 2012 and to October, 2013 working 12 hours a week at $9.00 per hour. The Plaintiff was assigned to the Delaware Department of Insurance (DOI) in Dover and, she worked in the Workplace

Safety Program under the supervision of Kathleen Humphries and Tanya Hahn. While at DOI (1-1/2 years), there were several positions that were filled without the plaintiff being invited or asked to apply for either more working hours and/or full-time and permanent employment. There was only one position in the Marketing Department that became available for which she was given the opportunity to apply and interview for and, of course, for which she was not hired for the position. The Plaintiff continues to claim that she is still being harassed on and off the job stemming from a spill-over from former MBNA America's employees, relatives and friends and, she has not been able to successfully find any permanent work since MBNA America as well as via online, fax and email. The Plaintiff has been injured by the irreparable harm that has been done to her on an ongoing basis in searching and finding steady and comparable employment because of this.

22. After the Census job ended in August, 2010, the Plaintiff enrolled and completed real estate school at the Long & Foster Real Estate School in Bear, Delaware from September to December, 2012 attending three nights a week for the four months. She successfully completed it and tested and passed the state licensing exam. Afterwards, she signed on with Long & Foster Real Estate, Inc. as a part-time Independent Sales Representative (Realtor) specializing in residential properties and, was only able to get three residential listings and, absolutely no real estate sales or commissions. She earned no income from this investment. The Plaintiff took a loss on her investment as a Realtor. Long & Foster's Broker was Ms. Judith S. Cook. The Plaintiff was a realtor with her company from March to November 2011. Meanwhile, Bank of America had become a subject of public wrongdoing as offenders as charged by the federal government in the Predatory Lending scandal that was exposed and, for which began back in 2008 as well as their role in the real estate mortgage crisis and housing bubble. Bank of America, to date, has already had to pay millions of dollars in settlements from lawsuits for their role in the scandal with possible felony charges to follow. And, even still today, the plaintiff is still unable to get past MBNA America (Bank of America) or, go back into real estate because of lack of funds which is one of the reasons why the "injunction" was needed in the first place to make them stop harassing and hindering the Plaintiff and her ability to return to the workforce on a full-time basis via recovering from their retaliation with a decent and respectable income.

23. The Plaintiff had continued to seek employment with Bank of America (MBNA America) as recent as 2011 and 2012 as a Home Service Specialist as some of the other former team managers from MBNA America were able to return to work for Bank of America in their Wilmington offices.

24. The Bank of America's building covers at least 2 full blocks in downtown Wilmington across from Rodney Square on French Street – just big enough of a presence to

10

    intimidate and influence anyone except, of course, Fair Housing and, the federal government.

25. Today, the Plaintiff is unemployed and has been out of work since October 25, 2013 and, is continuing her search for work and, has now filed for disability insurance from social security administration.
26. The discrimination case was filed with EEOC in September, 2006; it was finally processed in April, 2010 and, it got released in June, 2010 with a "right to sue" letter issued to the Plaintiff for filing a civil suit in court. It was signed off by several individuals at the EEOC's office, Kurt Jung, William D. Cook and, Phil Goldman for whom the Plaintiff feels had not handled her complaint correctly.

### IV. SUMMARY OF ARGUMENT

Introduction:

As a rule of thumb, most employment discrimination cases are filed because one or more members of a protected class was denied a privilege of employment due to race, color, sex, religion, age and or national origin, etc. with respect to compensation, terms, conditions or privileges of employment. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discrimination on these grounds. The Statute also prohibits discrimination in hiring, firing, promotion, transfer, job training and apprenticeship decisions.

1. The Plaintiff, Carlet D. Ward, was denied these very basic privileges – the opportunity to post and apply for open positions; and, to be hired for jobs she had interviewed for or, was qualified for, i.e. Marketing Program Manager; PIN Coordinator; Bank Teller, II; Home Services Specialist; and, Manager-in-Training Program as well as other on-line job searches available through her former employer, MBNA America (Bank of America).
2. Carlet D. Ward is Black, African-American and, female, currently 58 years old and unemployed. She is a member of a protected class and, she has been retaliated against in the form of "blackballing" by her former employer for pursuing a grievance and, via an "adverse employment action" of disciplinary and/or extreme corrective measures. She had become a victim of employment disparate treatment having a disparate impact.
3. The Defendants in this case, MBNA America (Bank of America), argued that the Plaintiff had not established a "prima facie" case; that she could not prove that she was retaliated against; and, that the case, itself, was time-barred (pages 32-46).
4. Ms. Ward effectively and successfully dismissed those claims and proved that she indeed have established a prima-facie case in that her complaint, in grievance form, resulted in adverse employment action of discipline and retaliation when she had initiated and

11

pursued a grievance procedure against management for not being able to post and apply for the job positions and, for not being hired or given the opportunity to be interviewed as stated under the company's equal opportunity statement in their part-time employee handbook. The fact that a white Caucasian male, a floor manager at the time, was given the opportunity to apply, interview and get hired for the Marketing Program Manager position and, the Plaintiff didn't, was an act of employment discrimination (pages 111-116).

5. Race is the motivating reason for the adverse action – a substantial factor in causing harm to the Plaintiff. Title VII prohibits retaliation against employees opposing employers practices. The elements of a cause of actin entails disparate treatment – MBNA America departed from their usual employment practice when the Plaintiff wanted to post, apply, be hired and/or take advantage of advancement opportunities when they became available. In this case, it is true to say that "employers treats some people less favorable because of race, color, etc." By departing, it established a "pretext" creating the hostile work environment for the Plaintiff subjecting her to racial epithet and harsh disciplinary actions. The employer, MBNA America, on the other hand, tolerated the unlawful employment acts committed against the Plaintiff and, allow it to continue – even today.

6. The elements as proven is (1) race discrimination; (2) retaliation in violation; and (3) adverse employment act in violation. If this case had gone to trial, these elements would have been easily proven by the Plaintiff. See Bette Clark v. Westrec Marina Management, CA Court of Appeal, First Appellate District 5 (2006); Griggs v. Duke Power Co., 401 U.S. 424 (1971); Washington v. Davis, 426 U.S. 229 (1976); Corley v. Jackson Police Department, 566 F.2d 994 (5th Cir. 1978); Caldwell v. Paramount Unified School District 1995 41 Cal App. 4th 189,205; Guz v. Bechtel Nat'l Inc. (2000) Cal 4th 317, 355; Mixon v. Fair Employment & Housing Comm.(1987) 192 Cal. App. 3d 1306, 1317; Rutherford v. American Bank of Commerce, 565 F.2d 1162 (10th Cir. 1977); Sabol v. Snyder, 524 F.2d 1009 (5th Cir. 1975); Rowe v. GMC, 457 F.2d 348 (5th Cir. 1972); Hazelwood School District v. U.S. 433 U.S. 299 (1977); Teamsters v. U.S. 324 (1977); Furnco Construction Corp. v. Waters 438 U.S. 567 (1978); Sias v. City Demonstration Agency, 588 F.2d 692 (9th Cir. 1978); Loeb v. Textron, 600 F.2d 1003, 1014 N-12 (1st Cir. 1979); Village of Arlington Heights v. Metropolitan Housing development Corp. 429 U.S. 252, 265-66 (1977); and Price Waterhouse v. Hopkins (1989).

7. Plaintiff successfully argued the Defendant's claim that the case was time-barred. Plaintiff contends that there was no real need for this argument to continue on and debated. The defendant's argument had already been defeated (pages 42-46). None of the foregoing arguments – prima facie and retaliation - shouldn't have been allowed to be

re-enter for admission as a means to grant the Defendant(s) a Summary Judgment in this case. See Bethel v. Jendvco Construction corp., 570 F.2d 1168 (3rd Cir.1978); Clark v. Olinkraft, Inc., 556 F.2d 1219 (1977); and Williams v. Norfolk and Western Railroad Co., 530 F.2d 539:11 Fair Empl.prac.cas. 836, 11 Empl.Prac.Dec. P 10,710.

8. Carlet Ward makes the claim that she was misrepresented by both the U.S. District Court and that her court appointed Attorney, Jack Shrum of Archer & Greiner, P.C.; that the court procedures and communications in this case broke down and then became an "ethics" issue and challenge. One that neither the U.S. District Court or, its Judge responded to or acknowledged – evidence was tampered with and damaged creating mistrust between client and lawyer relationship as well as setting the stage for a bias atmosphere between all parties involved including the judge. The test for Judiciary bias may be stated as such, "is not whether Plaintiff has proved harm but whether the court's decision would cause a reasonable person to doubt the impartiality of the judge or, would cause us to lack confidence in the fairness of the proceedings and its outcome." Such a bias would necessitate a Summary Judgment in favor of the defendants – in this case, that would be MBNA America (Bank of America).

9. Ward v. MBNA America did not get a fair chance or an opportunity to be heard in a court of law and, with a jury trial. This case still has merit. U.S. District Court Judge Sue L. Robinson, erred in her judgment, prematurely, unprofessionally and, misstep on several procedures that really needed to be moved on before the Motion for Summary Judgment submission came up and was submitted. Again, bias and unethical issues of conduct are in question as the Plaintiff ended up being abandoned by her court appointed Attorney Shrum, midway through the federal rules of civil proceedings, leaving her to fend for herself and finish the job as Pro Se.

10. The Seventh Amendment to the Constitution or as provided by a federal statute is preserved to the parties inviolate. Rule 38 demands it. The Civil Rights Act of 1991 supports it. Misteps, omissions, misrepresentation, bias, nonresponsiveness or, not acknowledging Plaintiffs correspondences and proceeding issues and questions by the Federal Judge is unacceptable, unlawful and, in violation including the "ethics" in question of the defendant's pleadings, depositions, interrogatories and conduct.

11. The right to a public trial with an impartial jury is what distinguishes this country from other countries not known for their freedom. This case is old but continuing and, not time-barred as the defendants would have the courts to believe – seven years in the making and still counting and, it's not going to go away anytime soon - especially now with a biased summary judgment in its prematurity stages as granted to the defendant(s) by Judge Robinson unless there is remedy, relief and damages awarded to the Plaintiff for

her suffering. It has been a known fact that "judges are trained on how to get rid of civil rights cases" – so Judge Robinson acted accordingly. See Hernandez, 109 Cal App. 4th at p.461; Catchpole v. Brannon (1995) 36 Cal App. 4th 237, 262;

12. Because Judge Sue L. Robinson grossly erred in her decision and judgment in favor of the defendants, MBNA America, the Plaintiff is appealing this decision in the Appellate Court of the Third Circuit and, is calling for a Judicial Standard of Review based on the above statements of the case and facts as well as on the following correction of action needed for a reversal on the appeal:
    1. Abuse of Discretion
    2. Substantial Evidence
    3. Reverse and overturn Judge Robinson's decision
    4. Recuse the Judge from any further proceedings in this case
    5. Re-open the Plaintiff's case in the U.S. District Court
    6. Set a trial date; and/or
    7. De Novo Review the case as it deems necessary to review the question of law for its "mixed-motive" intentions
    8. Consider recommendations on judicial and legal ethical misconduct in the form of punishment against the attorneys and the U.S. District Court and Judge involved in this case.

[See 28 U.S.C. 1291; Bette Clark v. Westrec Marina Management, CA Court of Appeal, First Appellate District 5 (2006); Price Waterhouse v. Hopkins 490 U.S. 288 (1989)]

Dated 2/11/14

Carlet D. Ward
Carlet D. Ward, Appellant & Pro Se
201 Voshells Mill Road
Dover, Delaware 19901
(302) 264-1895

Attachment: Appendix in Support of Opening Brief

14

## CERTIFICATE OF SERVICE

I, Carlet D. Ward, Plaintiff, do hereby certify that on this day, February 11, 2014, I have mailed a copy of the Appellant's Opening Brief and attached Appendix within to the following address:

Elena D. Marcuss, Esquire
McGuire Woods LLP
7 Saint Paul Street, Suite 1000
Baltimore, MD  21202-1671

*Carlet D. Ward*
Carlet D. Ward, Appellant, Pro Se
201 Voshells Mill Road
Dover, DE  19901
(302) 264-1895